UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


BOBBY L. BEASLEY,

      Plaintiff

v.                                CIVIL ACTION NO. 2:04-0505

MAYFLOWER VEHICLE SYSTEMS, INC.,

      Defendant


MEMORANDUM OPINION AND ORDER


Pending is defendant's motion for summary judgment filed March 7, 2005.


I.


In January 1997, plaintiff commenced full-time work for defendant.  (Dep. of Bobby Beasley at 7.)  He began as a manufacturing associate responsible for making automobile parts. (Id. at 8-9.)  In less than a year, he was promoted to manufacturing team leader.  (Id. at 9.)  Even subsequent to the institution of this action, defendant's human resources manager called plaintiff "a good worker."  (Dep. of Michael John Wilfred Fell at 51.)

In November 1999, the employees at defendant's facility voted to unionize.  (Id. at 12.)  On December 28, 1999, plaintiff was involved in a workplace mishap.  (Id.)  Plaintiff suffered severe injuries and subsequently sought workers' compensation and instituted an action under the deliberate intention statute, West Virginia Code section 23-4-2(d)(2).[1]  (Id. at 10.)

In January 2001, plaintiff returned to work.  (Id. at 11.)  As a result of unionization, the hourly manufacturing team leader positions were converted to salaried manufacturing group leader jobs.  (Id.)  The group leader positions were already filled in January 2001.  (Id.)  Plaintiff was consequently placed in a manufacturing associate position at a lesser hourly rate. (Id. at 13.)

---

[1]The parties refer to this lawsuit as a "Mandolidis" action. The West Virginia Supreme Court of Appeals has observed as follows::

> We are aware that the entire bench and bar of this State are tempted to use the term "Mandolidis" as a euphemism for a deliberate intention injury. Because we have now assigned the Mandolidis opinion as a relic of the common law with no relevance in our current workers' compensation jurisprudence, it might be an appropriate time to introduce "deliberate intention" into our lexicon of causes of action instead of "Mandolidis"--it no longer exists!

Bell v. Vecellio & Grogan, Inc., 197 W. Va. 138, 144, 475 S.E.2d 138, 144 (1996); see also Handley v. Union Carbide Corp., 804 F.2d 265, 269-70 (4th Cir. 1986).

2

Within six or seven months, plaintiff was offered a group leader position. (Id. at 15.)  When word of the offer was disseminated, plaintiff was advised by fellow hourly workers not to take the promotion in view of his ongoing deliberate-intention action against defendant.  One manufacturing group leader, Lloyd McVay, told plaintiff "with having a lawsuit and suing Mayflower . . . [you] would be crazier than hell to take a position such as that."[2]  (Id. at 16.)  Plaintiff was advised similarly by Bob Monk, also a manufacturing group leader at the time.  (Id. at 152.)  In October 2001, defendant settled plaintiff's deliberate-intention action for $300,000.  (Id.)

In August 2002, after months of persistent efforts by defendant, plaintiff accepted the manufacturing group leader position.[3]  (Id. at 15.)  Plaintiff asserts general manager John Haughian, in particular, knew about the deliberate-intention action and convinced plaintiff to take the job.  (Id. at 18.)

———————————

[2]When plaintiff was promoted, McVay was contemporaneously elevated to a supervisory position over all of the manufacturing group leaders.  (Id. at 27.)

[3]Plaintiff asserts defendant "stayed after" him for "roughly a month, a month and a half" before he accepted the promotion. (Id. at 15.)  It would appear from the time line, however, that it took plaintiff much longer to accept the position than he has estimated.

3

The promotion resulted in a $10,000 to $15,000 pay increase. (<u>Id.</u> at 16.)

Plaintiff freely admits his understanding that the promotion would mean his change in status to an at-will employee. (<u>Id.</u>)  When asked what the status change meant, plaintiff replied "I figure they can just get rid of you at any given time for any reason.  They don't even have to have a reason is what I've been told."  (<u>Id.</u> at 18.)

Plaintiff and his wife experienced some level of marital conflict during his time off and following his return to work.  This conflict eventually resulted in the institution of divorce proceedings and increased care responsibilities by plaintiff for his preschool-age daughter.  (<u>Id.</u> at 20-21.) Plaintiff asserts that any time he required a work-schedule accommodation, Haughian permitted him to leave early or not report at all.  (<u>Id.</u> at 35-36.)  He contends neither Haughian nor McVay ever spoke with him about his absences and late arrivals. (<u>Id.</u> at 33-34; <u>see also</u> aff. of Bobby Joe Beasley ¶ 2 ("I was assured by my general manager, John Haughian, in February of 2003 that my lateness or lack of attendance . . . would not be used against me to reprimand me or terminate me from employment.").) On February 7, 2003, consistent with plaintiff's understanding,

4

Haughian had a memorandum placed in plaintiff's file:

> He is currently going through a tremendous amount of
> stress due to his wife leaving him, along with several
> other personal issues.  Bobby is trying to work and
> look after his daughter, and rebuild his house and
> life.  So this [h]as resulted in Bobby taking some time
> off from work, and requesting early outs.  I would like
> us to work with Bobby and support him through this
> difficult period of his life, and it would be in our
> best interests not to use his attendance against him,
> by recording occurrences.  I request we log these as
> personal.

(Ex. E, Pl.'s Resp.)

On Thursday, April 3, plaintiff left work two hours early to attend his divorce hearing.  (Dep. of Bobby Beasley at 28, 44.)  On Friday, April 4, the day his divorce became final, he was late again.  (Id. at 20, 28)  After work that day, he visited a local bar known as the Purple Plum, where he ingested a quantity of alcohol.  (Id. at 46.)  During his visit, he became involved in an altercation in the bar parking lot at approximately 3:00 a.m. with his wife's boyfriend and another man.  (Id. at 48.)  According to plaintiff, they "fought like hell for about 10 or 15 minutes."  (Id.)  Law enforcement was called, but plaintiff left the scene prior to their arrival.  (Id. at 49.)  Plaintiff then returned home.  (Id. at 54.)

After sleeping "anywhere from two and a half to three and a half, four hours[,]" plaintiff showered and left for work

between 6:15 and 6:30 a.m.  (<u>Id.</u> at 56.)  He arrived "about two minutes late."  (<u>Id.</u> at 29.)  When plaintiff arrived, McVay and co-workers Brian White and Mike Eggleton inquired about his eye, which was blackened and swollen.  (<u>Id.</u> at 58-59.)  McVay inquired whether plaintiff had been drinking and further insisted that he go home and report back to work on Monday.  (<u>Id.</u> at 57-58.)  White and Eggleton noticed the smell of alcohol on plaintiff, and plaintiff concedes as much.[4]  (<u>Id.</u> at 154-55.)  McVay testified he did not smell alcohol and never advised anyone otherwise.  (Dep. of Lloyd McVay at 41.)  Plaintiff was not sent out for a blood-alcohol test, a step plaintiff asserts is standard practice when an employee is accused of reporting to work under the influence.  (Dep. of Bobby Beasley at 152.)

When plaintiff returned to work on Monday, April 7, McVay asked him to resign.  (<u>Id.</u> at 62.)  When plaintiff refused, McVay told him to go home and think about it for a day.  (<u>Id.</u>)  Plaintiff did so and reported back on Tuesday, April 8.  At that time, he met with Haughian, McVay, and Jana Dawson, the plant personnel manager.  (<u>Id.</u> at 63.)  Plaintiff insisted he was not drunk when he reported to work and that his injuries were the

---

[4]Plaintiff asserts he used mouthwash before leaving for work that morning.  (Aff. of Bobby Beasley ¶ 10.)

result of an altercation during off-duty hours.  (Id. at 64.)
When asked how much he had drunk, Haughian intervened and stated
what plaintiff did on his own time was not defendant's concern.
(Id. at 65.)

     Dawson told plaintiff that she had signed statements
from seven employees to plant manager Pete Peterson indicating
plaintiff was under the influence of alcohol.  (Id. at 150.)   In
reality, it appears reports were only obtained from Eggleton and
White.[5]  (Id. at 150-51.)  Dawson further suggested defendant
would have a risk management problem if it experienced a
workplace injury while plaintiff was on duty in that
"condition[.]"  (Id. at 61-62, 66.)  McVay, however, later stated
that he did not believe plaintiff was a safety risk when he
reported on Saturday, April 5.  (Dep. of Lloyd McVay at 44-45.)
Nonetheless, plaintiff was told defendant was not willing to take
the chance.  (Dep. of Bobby Beasley at 72.)

_____

     [5]White testified he "could notice a little smell of alcohol,
but he didn't appear drunk at all."  (Dep. of Brian White at 10.)
In an unsworn statement, Eggleton stated "yes pete [sic] I did
smell the beer on his breath But [sic] I did not stay around long
enough to check him Out [sic]."  (Ex. 8, Def.'s Mot. Summ. J.)
McVay, however, who was standing within four to five feet of
plaintiff at times, stated he never suggested to anyone that
plaintiff was intoxicated or impaired.  (Dep. of Lloyd McVay at
24.)  Alcohol use appears to have played no role in McVay's
decision to send plaintiff home.  (Id. at 21-24.)

7

Although McVay testified that he thought plaintiff was only terminated for habitual lateness,[6] (dep. of Lloyd McVay at 40), an April 8, 2003, letter placed in plaintiff's file states plaintiff was terminated, in part, for gross misconduct, after being reminded of defendant's policy regarding drugs and alcohol. (Dep. of Bobby Beasley at 21, 82; ex. F, Pl.'s Resp.)

Plaintiff asserts the drug and alcohol policy was enforced in a disparate manner.  (Id. at 83 ("It depends on who you are.").)  By example, he asserts as follows:

> I could tell you a time that Lloyd McVay come to work with the scent of alcohol on his breath, you know.  He went out all night.  I can tell you about every one of us, all of us salary people went out the night before and had a big party and then we had to come in and do inventory.  If you want to talk about hung over, we were all hung over.  We all had scents of alcohol, come in and do inventory.

(Id. at 106.)  Plaintiff also asserts no one ever defined for him what constituted gross misconduct.[7]  (Id. at 143.)  He was never

------

[6]The human resources director for Mayflower, Michael John Wilfred Fell, testified contradictorily on this point: "[it] was Mr. McVay's belief that he was impaired to a degree that he would be best not on the premises."  (Dep. of Michael John Wilfred Fell at 15.)

[7]McVay professed he had no idea what defendant believed to be gross misconduct on plaintiff's part.  (Dep. of Lloyd McVay at 40.)  Fell opined in his deposition testimony that gross misconduct would be indicated by alcohol on the breath, appearing
(continued...)

8

warned about any misconduct, including tardiness or absences,
prior to his termination, a warning process he asserts was
defendant's standard practice.[8]  (Id. at 146-47.)

Plaintiff asked if he could, as he asserts had been
done with two other individuals who had been terminated, return
to the hourly workforce.  The request was denied.  (Dep. of Bobby
Beasley at 96, 122, 128.)  Both during the April 7 meeting and
thereafter according to plaintiff, Haughian stated his belief
that there was not justifiable cause to terminate plaintiff.
(Id. at 100.)  Plaintiff asserts Haughian strongly took the
position during the meeting that plaintiff should not be
terminated.  An April 8, 2003, exit interview memorandum,  coming
a day after the meeting with plaintiff, however, states as
follows:

> [Haughian] then explained to Bobby that he was very
> disappointed in the outcome of this.  He had such high
> hopes for Bobby, but everyone has to follow the rules.
> He agreed with Jana that we do have policies to follow

---

[7] (...continued)
beaten up, or coming in late.  (Dep. of Michael John Wilfred Fell
at 45-46.)

[8] McVay asserts he counseled plaintiff about tardiness and
absences on prior occasions, at times transmitting written
"disciplinary corrective actions" to defendant's human resources
department.  (Dep. of Lloyd McVay at 27.)  Those warnings have
never been found.  (Id. at 35; see also dep. of Michael John
Wilfred Fell at 23.)

> and that the hourly employees look up to supervisors
> and that they need to set a good example.  He also said
> his work performance in the past several weeks were
> [sic] not up to par with someone who was a leader and
> an example setter.  The hourly people do look up to the
> supervisors and he didn't feel Bobby could continue in
> this role.

(Pl.'s Resp., Ex. F at 2.)  Haughian wrote favorable references

for plaintiff following his termination.

When plaintiff applied for unemployment compensation,

defendant challenged the request.  (Id. at 142.)  The Board of

Review for the West Virginia Bureau of Employment Programs

overruled the challenge, noting "the employer has failed to

present any evidence to show any real misconduct on the part of

the claimant."  (Pl.'s Resp., ex. B.)

On April 7, 2004, plaintiff instituted this action.

Defendant removed on May 21, 2004.  There is some uncertainty

concerning the claims pled by plaintiff.  The complaint appears

to allege just two claims, namely for (1) fraud, and (2) a

violation of West Virginia Code section 23-5A-1 ("anti-

retaliation claim").  Plaintiff's response to defendant's

dispositive motion asserts "his firing was illegal under West

Virginia law on at least two grounds; one being retaliatory

discharge and one being breach of implied contract."  (Pl.'s

Resp. at 1.)  Finally, the pretrial order appears to contain

10

three claims, asserting (1) an anti-retaliation claim under the West Virginia Workers' Compensation Act, (2) a wrongful discharge claim under Harless v. First National Bank, 162 W. Va. 116, 246 S.E.2d 270 (1978), and (3) a breach of an implied contract.

The basis for the Harless claim is that defendant violated the anti-retaliation statute.  The Harless claim thus appears duplicative of the anti-retaliation claim.  Plaintiff's counsel conceded as much at the pretrial conference. Accordingly, the court will address the anti-retaliation claim and the alleged breach of an implied contract.

II.

A.   The Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v.

11

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v.

12

Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B.   The Anti-Retaliation Claim

The anti-retaliation statute contained within the Workers' Compensation Act provides as follows:

> No employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive benefits under this chapter.

W. Va. Code 23-5A-1. Syllabus point 2 of Skaggs v. Eastern Associated Coal Corp., 212 W. Va. 248, 569 S.E.2d 769 (2002),

13

provides:

> "In order to make a prima facie case . . . {under the anti-retaliation statute], the employee must prove that: (1) an on-the-job injury was sustained; (2) proceedings were instituted under the Workers' Compensation Act, W.Va.Code, 23-1-1, et seq.; and (3) the filing of a workers' compensation claim was a significant factor in the employer's decision to discharge or otherwise discriminate against the employee."

Id. at 249, 569 S.E.2d at 770 (quoting syl. pt. 1, Powell v. Wyoming Cablevision, Inc., 184 W. Va. 700, 701, 403 S.E.2d 717, 718 (1991)).

It appears uncontested that plaintiff suffered an on-the-job injury for which he later instituted proceedings under the workers' compensation act. The lingering factual question, involving the vaporous issue of intent, is whether those proceedings were a significant factor in plaintiff's discharge. Although the parties sharply dispute the point, the court must view the record and all reasonable inferences in the light most favorable to plaintiff.

A variety of considerations could lead a reasonable jury to find in plaintiff's favor. First, Fell concedes plaintiff was a good worker. Second, plaintiff obtained benefits and a sizeable settlement from defendant under the workers' compensation act as a result of a serious workplace safety

14

violation. Third, when plaintiff was offered an at-will position
as a manufacturing group leader, he was warned not to take the
position given his ongoing lawsuit against defendant. Two
supervisors delivered the warnings, including one who later
played a significant role in plaintiff's termination. Also,
plaintiff only accepted the promotion after defendant vigorously
pursued him on the matter for some months.

Next, one must consider defendant's espoused reasons
for the termination. Fell observed that gross misconduct could
include (1) the smell of alcohol on plaintiff's breath, (2) his
tardiness, and (3) his physical appearance following the
altercation.

Regarding the smell of alcohol, McVay's account
conflicts with that of White and Eggleton. Interestingly, McVay
insists he did not smell alcohol on plaintiff and that it played
no role in his being sent home. On the other hand, Fell
testified to McVay's ostensible belief plaintiff was so
intoxicated that he should not remain on the premises. One must
also consider (1) defendant's failure to send plaintiff for a
blood test, (2) Dawson's grossly exaggerated observation
concerning the number of employees who smelled alcohol on
plaintiff, (3) plaintiff's assertions that the alcohol policy was

15

unevenly enforced, (4) the differing views between McVay and Dawson concerning the reason for plaintiff's termination, and (5) plaintiff's assertion that it was Haughian's view, later contradicted by the April 8 exit interview memo, that plaintiff should not have been terminated at all.

Regarding tardiness, one must begin with the February 2003 assurances to plaintiff by Haughian that his absences and tardiness would be tolerated. Also, despite McVay's assertions that he issued written warnings to plaintiff concerning his tardiness, those records have never been found. Indeed, plaintiff has testified he was not warned that his late reporting to work and absences would result in disciplinary action. The court also notes Fell's statement it would be unfair to terminate an employee for tardiness and absences after providing him assurances such would not be held against him from an employment standpoint. (Dep. of Michael John Wilfred Fell at 29-30.)

Regarding plaintiff's physical appearance, one must again note McVay's view that plaintiff was only sent home for being late. Also, the altercation occurred away from defendant's premises, and plaintiff asserts that, had he been less than candid and offered an alternative reason for his appearance, it would not have constituted grounds for dismissal.

16

In view of these considerations, the court concludes that a genuine issue of material fact remains on the question of whether plaintiff's institution of proceedings under the workers' compensation act was a significant factor in defendant's decision to terminate him.  Accordingly, the court ORDERS that defendant's motion for summary judgment be, and the same hereby is, denied as to the anti-retaliation claim.

B.    Breach of Implied Contract

Plaintiff asserts his at-will employment status was altered by an agreement with defendant to tolerate his tardiness and absences.  First, plaintiff asserts that, contrary to defendant's "RULES FOR PERSONAL CONDUCT[,]" ("rules") he was not provided a warning about his tardiness and attendance before being terminated.  The rules provide employees may receive a "WRITTEN WARNING" when they are absent or report late and that "[i]f further incident occurs [the defendant will] move to [the] next step."  (Pl.'s Resp., ex. I.)  Second, plaintiff relies upon Haughian's (1) verbal assurances, and (2) February 7, 2003, memorandum to the file concerning his desire that plaintiff's attendance deficiencies should be tolerated by defendant.

17

Plaintiff asserts "In West Virginia, it is established that, [sic] an exception to the employment at-will doctrine can be established by clear and convincing evidence of a contract or other substantial employment right being granted to the employee by the employer." (Pl.'s Resp. at 7.) Plaintiff's claim finds its genesis in syllabus points 3, 5, and 6 of <u>Cook v. Heck's Inc.</u>, 176 W. Va. 368, 342 S.E.2d 453 (1986):

> 3. Contractual provisions relating to discharge or job security may alter the at will status of a particular employee.
>
> . . . .
>
> 5. A promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable.
>
> 6. An employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons.

<u>Id.</u> at 369, 342 S.E.2d at 454. In a later effort to refine the rule in <u>Cook</u>, the supreme court of appeals created a significant exception in <u>Suter v. Harsco Corp.</u>, 184 W. Va. 734, 403 S.E.2d 751 (1991):

> 4. An employer may protect itself from being bound by statements made in an employee handbook by having each prospective employee acknowledge in his employment application that the employment is for no definite

18

period and by providing in the employment handbook that
the handbook's provisions are not exclusive.

5. An employer may protect itself from being bound by
any and all statements in an employee handbook by
placing a clear and prominent disclaimer to that effect
in the handbook itself.

Id. at 735, 403 S.E.2d at 752.  Additionally, in order to prove

an implied contract, plaintiff must demonstrate its existence by

clear and convincing evidence.  Syl. pt. 3, Adkins v. Inco Alloys

Intern., Inc., 187 W. Va. 219, 220, 417 S.E.2d 910, 911 (1992)

("[w]here an employee seeks to establish a permanent employment

contract or other substantial employment right, either through an

express promise by the employer or by implication from the

employer's personnel manual, policies, or custom and practice,

such claim must be established by clear and convincing

evidence.").

On August 31, 2002, when plaintiff accepted his

promotion, he executed a one-page document containing the

following provision:

Your employment and compensation with MVS-SC are "at
will" in that they can be terminated with or without
cause and with or without notice at any time, at the
option of MVS-SC or yourself, except as otherwise
provided by law.  The terms of this letter therefore do
not and are not intended to create either an express
and/or implied contract of employment withy [sic] MVS-
SC.  No manager or other representative of MVS-SC,
other than the President, has authority to enter in to
any agreement for employment for any specified period
of time or to make any agreement or contract to the
foregoing, and any promises to the contrary may only be

19

>           relied upon by you if they are in writing and signed by
>           the President.

(Def.'s Reply, ex. 1.)

This provision plainly negates any ostensible promise Haughian made to alter the at-will relationship.  Regarding the rules, the following sentence precedes the excerpt concerning provision of a warning prior to termination for tardiness or absences: "[defendant] . . . reserves the right to counsel or discipline employees, including discharge on any conduct which is believed to be contrary to [defendant's] or its customers interests.  Nevertheless, certain conduct may be more likely to result in counseling or discipline than other conduct."  (Pl.s' Resp., ex. I (emphasis added.)  In view of this reserved right, plaintiff cannot, by clear and convincing evidence, establish an implied contract claim in reliance upon the rules.  The rules are, at best, guidance to employees as opposed to promises.

Accordingly, the court ORDERS that defendant's motion for summary judgment be, and the same hereby is, granted as to the implied contract claim.

III.


Based upon the foregoing, the court ORDERS that defendant's motion for summary judgment be, and the same hereby is, denied as to the anti-retaliation claim and granted as to the implied contract claim.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: May 3, 2005

John T. Copenhaver, Jr.
United States District Judge


21